**PIRINCIN, Joseph, Individually and on behalf of all others similarly situated, et al., Plaintiffs,**

v.

**BOARD OF ELECTIONS OF CUYAHOGA COUNTY et al., Defendants.**

**Civ. A. No. C 72–526.**

United States District Court,
N. D. Ohio, E. D.
May 29, 1973.

Benjamin B. Sheerer, Cleveland, Ohio, and Leonard J. Schwartz, Columbus, Ohio, for plaintiffs.

John L. Dowling and Jeffrey L. Kocian, Cleveland, Ohio, for defendant Cuyahoga County Bd. of Elections.

P. Michael DeAngelo and John R. Louden, Columbus, Ohio, for defendant Ted Brown, Secretary of State.

Before WEICK, Circuit Judge, KALBFLEISCH, Senior District Judge, and THOMAS, District Judge.

WILLIAM K. THOMAS, District Judge.

In this action for declaratory and injunctive relief a three-judge court has

been convened to consider the request of the plaintiffs that the court declare that "the scheme of selection of members of the board of elections prescribed by Sections 3501.06 and 3501.07, Ohio Revised Code, violates the Constitution of the United States . . . and therefore is void, invalid and unconstitutional." It is further requested that all 88 county boards of elections be permanently enjoined from further service; and that the secretary of state be enjoined "from appointing any other persons as his representatives and members of the Board of Elections of the County of Cuyahoga in the manner prescribed under Sections 3501.06 and 3501.07, Ohio Revised Code." Title 35 of the Ohio Revised Code is entirely devoted to the election laws of Ohio. Hereafter the sections (3501.01 et seq.) of Title 35 will be cited, omitting the "Ohio Revised Code" designation.

The plaintiffs seek to act for themselves as representatives of various classes. The complaint states that plaintiff Pirincin is a registered elector in Ohio, a member of the Socialist Labor Party, and was that party's candidate for congressman from Ohio's 21st Congressional District in the general election of November 7, 1972. He sues on behalf of himself and all other Ohio members of the Socialist Labor Party.

Plaintiff Lampkin states that he is black, a registered elector in Ohio, and was an independent candidate for Congress from Ohio's 23rd Congressional District in the general election of November 7, 1972. He sues on behalf of all independent candidates and on behalf of all black residents of Cuyahoga County who are qualified electors.

Plaintiff Sheerer states that she is a female registered elector in Ohio. She sues for herself and all other women who are qualified and registered electors in Ohio.

Plaintiff Silverman was granted permission to intervene as a plaintiff on October 11, 1972. He states that he is 18 years old, a registered elector in Ohio, and an independent voter with no political party affiliation. He sues for himself and all other independent electors.

Defendants Hughes, Carney, Garofoli, and Stillman are the members of the Cuyahoga County Board of Elections. They and their successors are sued as representatives of the members of the boards of elections in all Ohio counties. Defendant Brown, the duly elected, qualified and acting Secretary of State of Ohio, is sued as the chief election officer of Ohio under Section 3501.04. The complaint continues, "Pursuant to Section 3501.06, Ohio Rev.Code he appoints the Board of Elections in each county to serve as his representatives."

Under the allegations of the complaint, admitted in defendants' answers, this court has jurisdiction of the parties and the subject matter of this complaint under 42 U.S.C. § 1983; 28 U.S.C. § 1343(3) and (4); 28 U.S.C. § 2201; 28 U.S.C. § 2281; and the First, Ninth, Fourteenth, Fifteenth, and Nineteenth Amendments of the United States Constitution.

## I.

The plaintiffs move for summary judgment. Countermotions for summary judgment are presented by the defendants. To support their motion plaintiffs have taken and filed depositions of the defendant Secretary of State Brown, and defendants Stillman, Hughes, Carney, and Garofoli, Cuyahoga County Board of Elections members. The report of the Special Committee to Investigate the 1972 Primary Election (Cuyahoga County) is attached as a deposition exhibit. Several lists of board members and county party officials compiled by the secretary of state are submitted with analyses. Additional documents are attached to the brief of the plaintiffs. Only undisputed portions of any submitted documents in the evidentiary record will be treated as fact in considering the rival motions.

Defendant Secretary of State has filed a memorandum contra the class action claims of the plaintiffs. These chal-

lenges to the representative claims will be considered in conjunction with the several summary motions.

Section 3501.06 whose constitutionality, together with that of Section 3501.07, is under attack, commences by providing:

> [That] there shall be in each county of the state a board of elections consisting of four qualified electors of the county, who shall be appointed by the secretary of state, as his representatives, to serve for the term of four years.

The section then fixes March first of each even-numbered year as the date when the secretary is to appoint one board member from the party which cast the highest number of votes for governor at the last preceding regular state election and the other from the party that cast the next highest number of votes for governor at the same election. Vacancies for unexpired terms and all appointments to new terms are to be filled from the party to which the departing member belongs unless there is a third party that cast a greater number of votes at the last preceding regular election for governor than did the party to which the retiring member belongs. In that case a representative from the third party shall fill the vacancy.

Section 3501.07 provides that not more than 60 nor less than 15 days before the expiration of a board member's term, the county executive committee of the political party entitled to the appointment may file a recommendation with the secretary of state. The secretary shall appoint the designated elector unless he believes the elector would not be a competent member. In that case he must submit his reasons in writing to the chairman of the county executive committee. The committee may then appoint another elector or apply for a writ of mandamus to the Ohio Supreme Court to compel the secretary to appoint the elector so recommended. The secre-

tary of state shall make the appointment if no recommendation is made. When a minor or intermediate political party is to fill the vacancy, officials of that party may within 15 days after that vacancy occurs recommend a person to the secretary for appointment.

Ohio boards of elections are directed by Section 3501.11 to exercise all powers granted by Title 35 and to perform all duties imposed by law. The section then specifies 19 paragraphs of board duties. The duties include the establishing and rearranging of election precincts; providing places for elections; appointing and removing the clerk, assistant clerks, employees, registrars, judges, and other election officers; and designating the ward or district and precinct in which each shall serve.

The board establishes the rules and regulations necessary to guide the election officers and voters. It advertises and contracts for the printing of all ballots. It investigates irregularities; nonperformance of duties, violations of Title 35 by election officers and other persons, and reports the facts to the prosecuting attorney. The board reviews and certifies the validity of petitions and nomination papers; receives election returns; and issues election certificates.

The board is further required to prepare reports for the secretary of state; prepare and submit to the proper appropriating officer a budget estimating the cost of elections for the ensuing fiscal year; investigate and determine the residence qualifications of electors; and perform such other duties as are prescribed by law or by the secretary of state.

Section 3501.11 concludes by providing that "in all cases of a tie vote or a disagreement in the board, if no decision can be arrived at, the Clerk shall submit the matter in controversy to the secretary of state, who shall summarily decide the question and his decision shall be final."

## II.

In the first cause of action the complaint alleges that the statutory scheme of selecting the boards of elections violates "the rights of plaintiffs and all others similarly situated in that it effectively fences them out of a vital part of the election process."

The Democratic and Republican parties are the two major parties in Ohio. Secretary Brown's testimony discloses that the executive committees of these parties in all 88 counties have always exercised their authority under Sections 3501.06 and 3501.07 to recommend electors to the secretary of state for appointment to county boards of elections. The secretary states that on six or seven occasions during his 22 years as secretary of state, he has rejected electors recommended by county executive committees. His rejections, presumably for incompetency, have been challenged in court on three occasions. On each occasion, he reports, he has been upheld by the court (presumably the Ohio Supreme Court). Ultimately in those instances other electors were recommended by the respective county party executive committee, and appointed by the secretary. Never has an executive committee failed to recommend electors for board positions. Consequently, Secretary of State Brown has never made an appointment to a board of elections, entirely on his own.

Plaintiffs refer to Sections 3517.03 and 3517.04 which indicate that county central committees consist of precinct committeemen who are elected in the party primary held in even-numbered years. Party executive committees in each county are selected by the county central committees.

Upon these facts and applicable law plaintiffs argue:

Ohio's selection system of members of board of elections disfranchises large segments of the electorate and therefore violates the Fourteenth Amendment right to equal protection and unlawfully burdens the First Amend-

ment's protection of right of free speech and association.

They say

[T]he relationship to the franchise is clear. The chain runs as follows: Recognized political parties in Ohio are entitled to hold party primaries. At the party primaries, members of the party are entitled to elect precinct committeemen to represent them in the county central committee. These precinct committeemen organize themselves as the County Central Committee and in turn select the party executive committee. Finally, the executive committee has the responsibility and authority to select the members of the board of elections.

Citing Section 3513.19 plaintiffs then assert:

Of course, the discrimination and exclusion occur since only members of the favored political parties can vote in the primaries.

Having alleged that the statutory procedure violates the Equal Protection Clause of the Constitution's Fourteenth Amendment and that it impinges on the franchise, the plaintiffs urge that the statutory scheme must be analyzed under the compelling state interest test, but should this court determine otherwise, that the procedure nevertheless fails to satisfy the rational basis test. The court, then, must first decide whether the Ohio system of selecting members of the county boards of elections "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

The Supreme Court has clearly indicated that the right to vote is fundamental.

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we

must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). *See also* Carrington v. Rash, 380 U.S. 89, 85 S. Ct. 775, 13 L.Ed.2d 675 (1965).

Mr. Justice Powell, however, in San Antonio Independent School District, *supra* observes that there are some limitations to the constitutional protection afforded the right to vote.

In note 74, Mr. Justice Powell states:

[Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274] fully canvasses this Court's voting rights cases and explains that "this Court has made clear that a citizen has a *constitutionally protected right* to participate in elections on an equal basis with other citizens in the jurisdiction." *Id.,* at 336, 92 S.Ct. 995, at 1000 (emphasis supplied). The constitutional underpinnings of the right to equal treatment in the voting process can no longer be doubted even though, as the court noted in Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), "the right to vote in state elections is nowhere expressly mentioned." [See following citations.] San Antonio Independent School District, *supra* at 411 U.S. 34, at 93 S.Ct. 1297.

Extending note 74, note 78 of the majority opinion declares that "the right to vote, *per se,* is not a constitutionally protected right." But the note recognizes

the protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population. *Id.* 411 U.S. at 35, 93 S.Ct. at 1298. *Accord Id.* at 59, n. 2, 93 S.Ct. at 1310. (J. Stewart concurring.)

 The members of the boards of elections are appointed by the secretary of state; and therefore Ohio has "not adopted an elective process" for selecting board members. Moreover, board members by law are representatives of the secretary of state. Section 3501.06. The sweep of duties of election boards, previously recounted, make it manifest that the function of the board is largely administrative. It is not legislative. Although the board members perform public duties, they do not "represent any segment of the State's population." Therefore, it is concluded that the right to vote, as that right is protected by the United States Constitution, is not impinged by the Ohio scheme of selecting members of the boards of elections.

Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) corroborates this conclusion. In *Sailors* the process of selecting the county school boards by delegates from nominated candidates was challenged as violating the Fourteenth Amendment. Yet the Court states that there was "no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election." *Id.* at 108, 87 S.Ct. at 1552. *Accord* Fortson v. Morris, 385 U. S. 231, 233, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966).

The plaintiffs, however, do not view the selection of board members as an appointive process. Instead, they insist that the secretary of state's appointment of county election board members is the inevitable result of several statutory steps that are derived from the election of county central committeemen. They contend that the "discrimination and exclusion occurs since only members of the favored political parties can vote in the primaries. (3513.19 ORC)."

The appointment of election board members by the secretary of state is four steps removed from the election of county central committeemen. Because of these intervening steps, those who vote in a party primary do not actually participate in the appointment of the

board members. Therefore, those persons who are not eligible to vote in the party primary are denied no real right of franchise.

As Section 3513.19 and related sections of Ohio's election laws are construed, political affiliation is not a hard and fast condition. State ex rel. Young v. Gasser, 21 Ohio St.2d 253, 255, 257 N.E.2d 389, 390–391 (1970) makes it clear that nowhere in the statutes "is anyone authorized to record his declared party affiliation or primary voting preference in connection with his registration." Moreover,

> If [an elector] never voted at [a regular state] election, his party affiliation or membership is that which he desires it to be from time to time. On the other hand, if he voted for a majority of candidates of one political party at the next preceding such election at which he voted, his membership in and affiliation with that political party would have been subject to proof without regard to his primary election activity. But his oath to that effect apparently may be required only if he were challenged as a primary voter (R.C. § 3513.19), as a candidate in a party primary election, or as a circulator or a signer of such a candidate's petition (R.C. § 3513.-07). *Id.* at 257, 257 N.E.2d at 391.

In practice Ohio's election laws permit and result in shifting party affiliations. Asked how registrants break down "in terms of percentages as far as members of the Republican Party, Democratic Party and Independents in Cuyahoga County," Board Member Saul Stillman answered, in part:

> I can give you a kind of a vague appraisal, but I couldn't give you a specific determinant, no, because the question as to whether or not a person is a Republican, Democrat or Independent seems to vary from election to election.

These questions and answers then follow:

Q I take it that the reason you have answered in this fashion, as I understand it, is [that] the main way of officially determining party membership is by whether or not a person asks for a particular ballot at a primary election?

A That is correct.

Q And that is otherwise the only indication of party membership required by the Board of Elections?

A That is correct. We do not ask a person his party affiliation at the time of registration or at any other time at the Board of Elections.

Thus with relative ease an elector can change party affiliation in Ohio. Yet even to the extent Ohio's election laws limit the right to participate in a party primary or be a candidate for political office, a person is excluded by reasonable restriction but not by a political caste system. There can be no discrimination of constitutional proportion when a man refrains from entering a party primary of one of the two major political parties because he regards himself an independent or a member of a minority party. Any "fencing out" of the electoral process that results in the operation of Ohio's statutory scheme for selecting elections board members is self-induced.

Nor is there any substance to the further contention in the first cause of action that

> [The plaintiffs] are without voice, vote or fair representation in the determination of matters crucial to the conduct of elections and the qualification of candidates. They are therefore denied equal protection of the laws contrary to the Fourteenth Amendment to the United States Constitution.

It would be no more sound to argue that a person who voted for the losing candidate for governor is denied voice, vote, and fair representation as to persons nominated by the successful candidate for governor to fill important offices in state departments, agencies, or

boards. Furthermore, whether or not an elector has voted for a precinct committeeman, as long as he votes for governor he has the right to help influence the selection of board members, since only the parties of the two top vote getters in the gubernatorial election are represented on boards of elections.

Ohio's scheme for selecting board members, it is concluded, does not infringe upon the right to vote, or more specifically, as Mr. Justice Powell puts it,

the protected right . . . to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population. San Antonio Independent School District, *supra* 411 U. S. 35, n. 78, 93 S.Ct. 1298.

█ It is clear that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review," Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972); McDonald v. Board of Election, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). Ohio's procedure for selecting members of county boards of elections need not receive close judicial scrutiny.

Once it has been determined that the statutes create no "real and appreciable impact on the exercise of the franchise," only a rational basis need be shown to support the constitutionality of the statutes. *Cf.* Bullock v. Carter, *supra*, 405 U.S. at 142–144, 92 S.Ct. at 856. In analyzing state statutes,

State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

It thus becomes essential to see "if any state of facts reasonably may be conceived to justify" the appointment of elections board members from the two political parties which cast the highest number of votes for governor as required by Sections 3501.06 and 3501.07.

The legislature has imposed responsibility for the operation of the state's election machinery upon the secretary of state, an office created by the Ohio Constitution and filled by a state-wide election (Ohio Const. art. III, § 1). The legislature has designated the secretary of state as the chief election officer (Section 3501.04). The elections board members are his representatives (Section 3501.06). The legislature has specified the election supervisory duties and powers of the secretary of state and has mandated that the secretary shall,

Compel the observance by election officers in the several counties of the requirements of the election laws. Section 3501.05(L).

In providing that elections board members shall be appointed by the secretary of state from the parties with the two highest votes, the legislature recognizes that these parties have a major stake in the holding of elections and should jointly share responsibility for administering the election system. By requiring the appointment by the secretary of state of two competent electors from each party as board members, serving as representatives of the secretary of state, the legislature creates a county elections board with built-in checks and balances to bring about and ensure the performance of its several statutory duties.

At the present time the secretary makes appointments to the county boards of elections from the Republican and Democratic parties because these parties are the two that have polled the highest number of votes for governor. However, Section 3501.06 protects against locking in these two parties. Another political party may recommend persons to fill positions on boards of elections should that third political party

amass the highest or the next highest number of votes in the state at the last preceding gubernatorial election. Even independent voters may form a political party pursuant to Section 3517.01 and become eligible to become one of the two parties from which members of the county boards of elections are selected. Since Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), Section 3517.01 has been amended to permit such petitioners to file signatures numbering only one percent of the total vote for governor at the preceding election. Thus, the opportunity to have representation on each county board of elections is available to all political parties.

The reasonableness of the method of selection of boards of elections may be tested by considering alternative methods. Were each county board enlarged to include representatives of all minority parties as well as independent voters, it is likely that the boards would be unwieldy. They would be too large to function as election machinery managers. Moreover it is apparent that one or two independent voters who might be appointed could not truly serve as adequate representatives of all independent voters. Each independent voter can really only represent himself.

Appointment by the secretary of state of county boards of elections members without the provision that the members shall be from the two parties receiving the highest votes, based upon recommendations of county executive committees, would likely be different in form but not in substance. It could reasonably be foreseen that the secretary of state would still turn to the county executive committees to recommend competent persons for board membership. A similar result might be anticipated if the sizeable task of appointing board members were shifted from the secretary of state to the governor as was true in 1890. (*See* Tit. XIV, ch. 2 Rev.Stat. of Ohio, § 2926(b) (1890)).

None of these alternative methods would appear to be preferable to the present method. Nor would the popular election of board members likely be more satisfactory. For example if elections were at large it is likely that in those counties of predominantly one party, members elected to the board predictably would be either all Republican, all Democratic, or a majority of one party. To permit the duties and business of a county elections board to be placed in the hands of any single political party could lead to favoritism to that party at the polls in counting ballots and in conducting the day-to-day board operations.

■ Measured by its own provisions, and compared with possible alternatives, the statutory framework for supervising and conducting elections in Ohio, including the creation and selection of county elections boards, is both practical and reasonable.

Plaintiffs refer to the "May primary fiasco," *i. e.*, the Cuyahoga County May, 1972 primary. Plaintiffs' brief quotes from the examination of the then director of the Cuyahoga County Elections Board when he testified before the Special Committee that investigated the election. Unchallenged as to accuracy the quoted exchange concluded:

> Q . . . Does this Board hire and fire on your recommendation or do they just hire and fire at will, completely going around you and you have absolutely no authority, in other words, you just have to work with the people that they gave you?
>
> A No, I make a request to the Board. Like when summer help is needed I will say I need fifty people for summer help, 25 Democrats, 25 Republicans. They provide the fifty people.

Plaintiffs offer this testimony to support a claim that

> the hiring of even the employees of the Local Board is not done with an eye toward the performance of the job but as to the political pedigree of the person considered for hiring.

Plaintiffs then argue that "this court should hold that a system which permits

this type of implementation violates the Constitution."

Surely a county board of elections cannot conduct elections honestly and efficiently unless it hires a director, supervisors, and employees "with an eye toward the performance of the job," rather than the person's "political pedigree." By its questioning of the director, previously quoted, the Committee indicates that the director must insist on competent employees. The report of the Committee emphasizes the responsibilities of the supervisors, the director, and the board when it thus summarizes the cause of what it calls the "election disaster:"

> In short, it is obvious that the supervisors in the various departments did not supervise, that the Director of Elections did not direct, and that the Board failed in its responsibilities to keep informed of the activities of the Director and supervisors.

Having in mind the then imminent November, 1972 election the Committee recommended that three board members be placed on probation. The report continues:

> If the coming election is satisfactory, we recommend the members of the Board be retained and probation be lifted. If the election is not satisfactorily completed, we recommend their dismissal.

> We believe that the best interest of the community will be served by retention of all four Board Members for this election. We believe they have learned a great deal from the failures of the last election and will be unusually alert to prevent repetition of those mistakes in the election so soon to come.

The Special Committee made detailed recommendations in Part Two of its report to improve the board's management and the performance of the board's employees. It may be presumed that the board had "learned a great deal from

the failures of the last election." It is judicially noted that the election was "satisfactorily completed." This was in contrast with conditions in the May primary that caused Chief Judge Battisti of this court to order an extension of voting hours until 11:59 p. m., in certain precincts and to order a new voting day in those districts where the polling places never opened. *See* John M. Coyne v. Cuyahoga County Board of Elections, C 72–434 (N.D.Ohio, May 2, 1972).

The May, 1972 "election disaster" in Cuyahoga County does not demonstrate that Ohio's method of selecting county election board members "violates the Constitution." Rather, it is a classic case of a breakdown in the election machinery when

> the supervisors . . . did not supervise . . . the Director of Elections did not direct, and . . . the Board failed in its responsibilities to keep informed of the activities of the Director and supervisors.

Upon the entire record "a state of facts reasonably may be conceived to justify" the Ohio statutory scheme of selecting members of Ohio's 88 county boards of elections. Consequently the rational relationship test is satisfied. It is determined that Sections 3501.06 and 3501.07 do not violate the plaintiffs' constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

To support their attack on the validity of Ohio's scheme for selecting members of county boards of elections, plaintiffs cite Weiss v. Duberstein, C 70–1200 (S. D.N.Y., Oct. 5, 1970), rev'd 445 F.2d 1297 (2 Cir. 1971); C 70–1200 (S.D.N. Y., Sept. 1, 1971), aff'd 465 F.2d 1405 (2 Cir. 1972), cert. den. sub nom. Lefkowitz v. Weiss, 409 U.S. 876, 93 S.Ct. 127, 34 L.Ed.2d 130 (1972), a case involving a constitutional challenge to Section 31 of the New York Election Laws, McKinney's Consol.Laws, c. 17 [1] that is com-

---

1. Section 31 of the New York Election Law provides in part that,

The respective chairman of the county committees within the counties of New

parable to Sections 3501.06 and 3501.07 of the Ohio law. Plaintiffs say that "this holding is, we believe, sound and should be followed here . . . ."

Plaintiffs Peter Weiss and Lillian Robinson sued on behalf of themselves and the class consisting of all registered Democrats and Republicans of Bronx, Queens, and Richmond Counties to have Section 31 of the New York Election Law declared unconstitutional. On October 5, 1970, Judge Frankel abstained, as he put it later, "pending legislative correction of the seeming anomaly." A bill passed by the New York legislature that would have obviated the constitutional problem was vetoed. On appeal, Judge Frankel's order was reversed and the case remanded for consideration on the merits, 445 F.2d 1297, 1303 (2 Cir. 1971). The Court said of Section 31:

> The limitation of the certifying authority to the chairman of the two dominant political party committees of only two of the five boroughs raises a constitutional issue, namely, whether there is a rational basis for so limiting the certificating authority.

(This holding is therefore appellate authority for the conclusion, heretofore reached, that the challenged Ohio statutes should be appraised under the rational relationship test.)

On September 1, 1971, Judge Frankel ruled:

> Nobody even suggests the existence of a rational basis today for the questioned statute. Plaintiffs would appear to have established without question their claim that discrimination against them and other residents of the Bronx, Queens, and Richmond Counties is now entirely arbitrary, capricious and, in the key words, a denial of the equal protection laws to which they are entitled under the Fourteenth Amendment.

Judge Frankel's ruling of September 1, 1971, has since been affirmed by the United States Court of Appeals, 465 F. 2d 1405 (2 Cir. 1972). However, the Court modified Judge Frankel's implementing order of September 24, 1971.

On June 1, 1972, in a memorandum Judge Frankel noted "regrettably, the effort for legislative correction has failed." He then entered his final order;[2] and this order actually supports the constitutionality of Sections 3501.06

York and Kings, and . . . the respective chairmen of the county committees of all the other counties of the state, of each of the two political parties which at the general election last preceding . . . cast the highest and the next highest number of votes for governor, shall each respectively make and file in the case of the counties of New York and Kings with the city council of the City of New York and in the case of each of the other counties with the board of supervisors or the county legislature of such county a certificate in substantially the following form, each of which certificate shall certify the name of a person who is a resident and a qualified voter, in the case of the counties of New York and Kings, of the City of New York, or in the case of the other counties a resident and qualified voter of the county and who was recommended as a fit and proper person to be appointed a commissioner of elections: . . . .

2. "Until New York Election Law Section 31 is amended to conform to the Constitution of the United States, the functions of the board of elections in the City of New York shall be executed by not more than four commissioners of elections to be appointed by this court, who shall be qualified voters resident within the City of New York, of whom there shall be equal numbers from the political parties which at the 1970 general election cast the highest and next highest number of votes for governor, unless new commissioners of elections are appointed as follows: (1) The respective chairman of the county committees of each of the said two political parties for each of the five counties within the City of New York may meet together and may, not later than June 22, 1972, by certificates filed with the New York City Council substantially in the form set forth in New York Election Law Section 31, recommend candidates for commissioners of elections, with each party recommending two nominees, who shall be residents and qualified voters of the City of New York. Three of the five county chairmen shall be required to concur in a recommendation. . . . ."

The remaining paragraphs of Judge Frankel's order provides for carrying out the

and 3501.07 of the Ohio Revised Code. Upon remand Judge Frankel had declared Section 31 unconstitutional because it violated the Equal Protection Clause. His final order, affirmed by the Second Circuit, actually eliminated only that portion of Section 31 that permitted the chairman of the county party committees for New York and Kings Counties to recommend electors for commissioners of elections to serve all five boroughs of the City of New York. In Judge Frankel's final order the court retained the scheme of Section 31 that authorized chairmen of the county committees of the two parties receiving the highest and the next highest votes in the last gubernatorial election to recommend electors for appointment by the appropriate legislative bodies.

### III.

As the second cause of action, plaintiffs state:

> The scheme alleged above violates the plaintiffs' right in that their right to cast an effective ballot is impaired contrary to the First Amendment to the United States Constitution.

 Much of what has been previously discussed negates this claim of the plaintiffs. Moreover, plaintiffs set out no evidence that indicates any violation of First Amendment rights. As to their right to cast an effective ballot they are treated no differently than any other electors who are not parties to this suit. The effectiveness of their ballot is in no way impaired by the composition of the county boards of elections and their First Amendment rights, therefore, are not violated.

 The third and fourth causes of action charge a denial of Due Process of Law in violation of the Fourteenth Amendment. The third cause of action attempts to phrase a Due Process violation in terms of the plaintiffs being "effectively shut out of the decision making process." This merely restates the claim of the second cause of action. For the reasons previously stated this argument does not establish a constitutional violation, whether it is evaluated as an Equal Protection or a Due Process claim.

The fourth cause of action presents a new claim. It is contended that members of the boards of elections, compensated for their duties under Section 3501.12, are "dependent upon recommendation of the county executive committee of their political party and the appointment of defendant Brown." Because of this, plaintiffs allege, "a divided loyalty is created thereby depriving the plaintiffs and those they represent of a tribunal in which they are afforded due process of law."

Consideration of this claim must commence by placing the adjudicative functions of a county board of elections in proper perspective. The recitation of duties delegated to a county board by Section 3501.11, and previously reviewed, reveals that these duties are largely administrative. This was corroborated in the report of the Special Committee when it declared in connection with the May, 1972 primary election that the Cuyahoga County Board of Elections "failed in its responsibilities to keep informed of the activities of the Director and supervisors." Compared with their administrative functions county boards of elections perform infrequently in a quasi-judicial role. *See* McGowan v. Board of Elections, Ohio App., 64 Ohio Law Abst. 307, 111 N.E. 2d 689, 690, aff'd 157 Ohio St. 428, 105 N.E.2d 639 (1952). *See generally* Socialist Workers Party v. Rockefeller, 314 F.Supp. 984, 997 (S.D.N.Y.), aff'd 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970) (wherein similar due process attack on the New York election board system by a minority party was denied).

To demonstrate "the probable partisan temptations to members of the board of

---

quoted paragraphs of his order. Significantly, it is ordered: "That the New York Election Law shall, to the extent not inconsistent with this order, govern the powers, duties, conduct and compensation of the commissioners appointed pursuant hereto . . . ."

elections," plaintiffs point to the "frequency with which the parties have seen fit to make the same person an officer in the party and a member of the board of elections." Plaintiffs rely on statistics compiled from official lists of Secretary of State Brown.

The composition of Ohio boards of elections as they were organized in March, 1972 and March, 1970 has been analyzed by the plaintiffs. For the year 1972, 53.4 percent of the board chairmen, 40 percent of the board members, 17 percent of the board directors, and 19 percent of the board deputy directors held party office. A total of 35 percent of the board officers throughout Ohio in 1972 held office as county party chairman or secretary. For the year 1970, analysis indicates that 45.4 percent of the board chairmen, 41.6 percent of the board members, 17 percent of the board directors, and 41.6 percent of the board deputy directors held party office. A total of 36 percent of board officers throughout Ohio in 1970 held office as county chairman or secretary.

With reference to the Cuyahoga County Board of Elections, plaintiffs note that the two Republican members of the board are respectively chairman of the county executive committee and chairman of the county central committee. One of the Democratic board members is a co-chairman of the Cuyahoga County Democratic Party and of the Democratic county executive Committee. The other Democratic member is vice chairman of the latter committee.

When, as in Cuyahoga County, the scheme of selecting county election board members results in top party officials becoming board members it is not surprising that some have asked whether party officials should serve as board members. Yet that question, not being a constitutional question, is not for this court to decide. The due process question raised by the plaintiffs, and which this court must decide, is presented by the argument of plaintiffs that,

[M]embers of county boards of elections do indeed serve two masters and must have a divided loyalty in certain matters that come before them. This exists because they are appointed by the executive committees of their political parties.

Their argument continues,

It may be that the legislature thought that by having two Republicans and two Democrats on the boards of elections possible tendencies toward unfairness or partisanship would be offset. In one sense this is but a recognition that party loyalties may come into play in board members and hence should be checked by party loyalty in the other direction by other members.

No legislative history is available to verify this probably correct reading of the legislative mind. Always appointed in Ohio, boards of elections have been elected in substantially the same manner since 1896. An act passed that year provided that in all counties with cities of a certain classification the board was to consist of

four electors of such county of well known intelligence and integrity, two of whom shall belong to each of the two leading political parties which cast the highest and the next highest number of votes in such county . . . Act of April 16, 1896, § 2926b–1, 92V167 (Ohio Session Laws).

The statutes further authorize the secretary of state to appoint board members from recommendations made by the party executive committees. *Id.* This statutory scheme continues to the present without substantial change.

For a number of years it was provided that no action of the board was valid without the vote of three out of four members of the board. Ohio's election laws in 1929 were completely revised, effective January 1, 1930 (Act of April 5, 1929, 113 V. 311 (Ohio Session Laws)). Since then "in all cases of a tie vote or disagreement in the board, if no decision can be arrived at" the secretary of state upon submission of the matter in controversy, "shall summarily decide the question and his decision shall be final." *See* General Code of

Ohio § 4785–13, and Ohio Rev.Code § 3501.11. When an equal division of the four members, whether or not along political lines, prevents a decision from being reached by the elections board, the secretary of state casts the deciding vote.

Elected at large as a state officer the legislature in effect designates the secretary of state as the public member of the elections board with summary power to decide the controversy. By adding the secretary of state as a public member the legislature has provided a workable decision-making process to settle election controversies, free of any inherent partiality. The present secretary of state, who has served for 22 years, indicates he fully understands his public, nonpartisan role. He testified that he instructs board members to "leave their political hats outside."

Plaintiffs press their argument further. They say:

What [the offsetting party loyalties] ignores, of course, is that at times the party loyalties may coincide to the detriment of individuals *who are political independents* or members of the minority or third parties.

Plaintiffs do not claim or attempt to show any situation in which they or any persons whom they purport to represent have been the recipient of any decision of county elections board, let alone any decision in which they claim that the board acted partially.

Plaintiffs, however, attempt to document this charge by referring to two cases decided by Judge Thomas D. Lambros of this court. In Capers v. Board of Elections, C 71–573 (N.D.Ohio, June 18, 1971) the court overturned the board's interpretation of the Cleveland City Charter, requiring independent candidates for mayor to file earlier than partisan candidates. However, the court did not indicate that any question of party loyalties was involved in the board's decision and the court even noted that one member voted against the board's interpretation. In Hawkins v. Board of Elections, C 71–1013 (N.D.

Ohio, Oct. 21, 1971), *see also* State ex rel. Hawkins v. Cuyahoga County Board of Elections, 28 Ohio St.2d 4, 274 N.E.2d 563 (1971), Judge Lambros denied the plaintiff's petition seeking to place him on the ballot as an independent candidate. The constitutionality of the state statute requiring the filing of an original statement of candidacy was not raised. Judge Lambros found no discrimination. He did say that he believed "that the Board of Elections should have acted in a different manner," and that "good judgment was not exercised . . . in denying the validity of the petition papers." However, nowhere in his opinion does he suggest that party loyalties entered into the board's ruling.

These cases do show that the federal courts are open for redress by an independent candidate for office in Ohio who contends that he has suffered a constitutional deprivation of his right to run for office. These cases, however, offer no proof that the board of elections acted towards these independent candidates in a manner that violated their constitutional rights by exhibiting a partisan bias against them as independents. Patently in neither of these cases did the court make any finding that when an independent candidate brings a matter before a county board of elections his matter is being heard by an inherently partial tribunal.

The record is devoid of any proof that a county board of elections, comprised of Republican and Democratic members, and frequently officials of these two parties, is an inherently partial tribunal when it hears election controversies that involve independent candidates or minority party candidates. Nor will such a built-in bias be inferred.

Absent a finding on this record that the board is inherently biased towards independent or minority party candidates, the present case is not controlled, as plaintiffs contend, by Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) and Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.

Ed. 749 (1927). In both *Tumey* and *Ward* the Court addressed itself to the question of whether a criminal defendant was deprived of due process when the mayor acting as judge in the case had a direct pecuniary interest in a conclusion against the defendant (*Tumey*) or when the revenue produced from the mayor's court provided a substantial portion of a municipality's funds (*Ward*). The Court in *Ward*, repeating language from *Tumey*, stated:

Although "the mere union of the executive power and the judicial power in him cannot be said to violate due process of law," *Id.*, 534, 47 S.Ct. 437, 445, the test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant or which might lead him not to hold the balance nice, clear and true between the State and the accused . . . ." *Id.*, 532, 47 S.Ct. 437, 444. Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This too is a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Id.*, 534, 47 S.Ct. 437. *Ward, supra,* 409 U.S. at 61, 93 S.Ct. at 83.

Gibson v. Berryhille, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) reaffirms the principle that pervades *Tumey, supra,* and *Ward, supra.*

It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). And Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey.*

The compensation of board members "shall be determined on the bases of the population of the county," Section 3501.-12. Thus, the compensation of board members does not relate to the exercise of any of their duties. Hence, *Tumey* and *Ward* are not presently controlling.

In *Gibson, supra* at 411 U.S. 579 n. 17 the Supreme Court, citing cases, observes,

The extent to which an administrative agency may investigate and act upon the material facts of a case and then, consistent with due process, sit as an adjudicative body to determine those facts finally has occasioned some divergence of views among federal courts.

It is true that one of the duties of a county election board is to "investigate irregularities, nonperformance of duties, or violations of Title XXXV [35] of the Revised Code by election officers and other persons. . . ." Section 3501.-11(J). However, this record does not present any situation nor suggest any basis for any claim that the investigative and adjudicative functions of an elections board are inconsistent with due process.

Moreover, note 17 must be read in conjunction with Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). There a claimant for disability insurance benefits under the Social Security Act contended that the hearing procedure was invalid on due process grounds. He said that "the hearing examiner has the responsibility for gathering the evidence and 'to make the Government's case as strong as possible;' that naturally he leans toward a decision in favor of the evidence he has gathered . . . ." *Id.* at 408–409, 91 S.Ct. at 1431.

The Court responded:

Neither are we persuaded by the advocate-judge-multiple-hat suggestion. It assumes too much and would bring down too many procedures designed, and working well, for a governmental

structure of great and growing complexity. *Id.* at 410, 91 S.Ct. at 1432. Plaintiffs' allegation that the procedure of selecting the board members creates a divided loyalty which deprives the plaintiffs of due process also "assumes too much" and it, too, would bring down procedures that have worked reasonably well in ensuring honest and fairly run elections.

"The fundamental requisite of due process of law is the opportunity to be heard." Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Any scheduled hearing must be "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Plaintiffs do not allege any deprivation of these fundamental due process rights, and it is, therefore, presumed that the boards of elections satisfy these fundamental due process requirements.

Finally, Ohio law provides that a board's decision is subject to judicial review where there are allegations that the board's decision involves "fraud, corruption, abuse of discretion or a clear disregard of statutes or legal provisions applicable thereto . . .." State ex rel. Flynn v. Board of Elections of Cuyahoga County, 164 Ohio St. 193, 129 N. E.2d 623, 624 (1955). In Ward v. Village of Monroeville, *supra* 409 U.S. at 61, 93 S.Ct. 80 the Court states that the "procedural safeguard" of appeal or a new trial which provides the defendant an impartial adjudication does not make the state's trial court procedure constitutionally acceptable. However, since the court in the instant case has determined that the board representation does not deprive plaintiffs of due process of law, the availability of judicial review represents a protection that further enhances the constitutionality of the challenged statutory requirements.

## IV.

Plaintiffs' remaining causes of action allege that black and female electors are discriminated against by the practice, custom, and usage of the statutory scheme since none of the board members in Cuyahoga County are or ever have been black or women. As a result, plaintiffs allege, the right to vote of blacks and women is abridged in violation of the Fifteenth and Nineteenth Amendments respectively.

The official lists of board members supplied by the secretary of state do not reflect the race of board members. Nor have the defendants refuted plaintiffs' claim that blacks have never been members of the Cuyahoga County Board of Elections. The court, however, judicially notes that subsequent to the "election disaster" in May, 1972 a black was appointed and continues as director of the Cuyahoga County Board. Nevertheless, even were it shown that no blacks have served on any county election board there is nothing in this record to show that this is due to any deliberate discrimination under a statutory scheme of selection of members that is manifestly neutral on its face.

The official list of board members supplied by the secretary of state does disclose the number of women on county boards in 1970 and 1972. The defendants have also answered that the Cuyahoga County Board at one time had a woman member. Statewide, the secretary of state's records reveal that in March, 1972 eight percent of the chairmen, 10 percent of the members, 53 percent of the directors, and 68 percent of the deputy directors were women. An analysis of the March, 1970 board lists discloses that 7 percent of the chairmen, 11 percent of the members, 46 percent of the directors, and 69 percent of the deputy directors were women. The statutory scheme of selection of board and election officials operates in a neutral manner in the area of sex. Additionally, there is nothing in this record to suggest that the imbalance of women on boards of elections is the result of any deliberate discrimination.

Accordingly, whether the claims of plaintiffs Lampkin and Sheerer are treated individually or as class action

claims it is concluded that there is no violation of the Fifteenth and Nineteenth Amendments.

It is not the duty of this court to fashion a system for selecting members of Ohio's boards of elections. It is only necessary to determine whether the long-existing Ohio scheme of selection is offensive to the United States Constitution. Upon the entire record it is concluded and determined that Sections 3501.06 and 3501.07 pass constitutional muster.

Since any finding that Sections 3501.-06 and 3501.07 are unconstitutional adversely affects other members of each class which the plaintiffs claim to represent it is determined that the case has proceeded properly as a class action. Rule 23(a) and (b)(1)(A) and (B), Federal Rules of Civil Procedure. Plaintiffs' motion for summary judgment that the sections are unconstitutional is denied. The motions of the defendants, other than the motion attacking the class action aspect of the plaintiffs' claims, are granted. The action of the plaintiffs is dismissed with prejudice at their costs.