Harley McLAIN, Plaintiff,

v.

Ben MEIER, Secretary of State and Allen Olson, Attorney General, Defendants.

Civ. No. A78–3075.

United States District Court, D. North Dakota, Southeastern Division.

July 15, 1980.

---

**464**

Harley McLain, pro se, Steven L. Pevar, American Civil Liberties Union, Denver, Colo., Renee J. Homuth, Stefanson, Landberg & Alm, Ltd., Moorhead, Minn., for plaintiff.

Murray G. Sagsveen, Sol., Brian Bjella, Asst. Atty. Gen., Bismarck, N. D., for defendants.

1. Reference to the Code will hereinafter be omitted and it will be understood that statutory sections refer to the Code.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

Plaintiff Harley McLain, with the assistance of the American Civil Liberties Union, brought this action pursuant to 42 U.S.C. § 1983, challenging the constitutionality of three North Dakota election laws alleging the statutes operate to infringe upon his rights guaranteed him under the first and fourteenth amendments to the United States Constitution.

Section 16–04–20 of the North Dakota Century Code[1] requires a third party to obtain 15,000 signatures by June 1 of an election year in order to become a recognized party entitled to a separate column on the ballot.

Section 16–11–05(4) groups all individual nomination candidates in one column on the election ballot under the designation "Independent Nominations" while § 16–04–20 provides for separate columns for the Democratic, the Republican and any other party meeting the requirements of the statute.

Section 16–11–06 requires that the first or left hand column on the ballot be reserved for the party that received the most votes in the last congressional election, the second column for the party that received the second highest number of votes, and so forth. Individual nomination candidates are not mentioned.

The case is before the court on the parties' cross motions for summary judgment. At a hearing, the parties stated they had no additional evidence to present and that the court could treat as evidence the affidavits submitted in support of the motions.

The factual background of the case is as follows. At some time prior to June 1, 1978, plaintiff, a vegetable farmer who opposes the use of chemicals in farming, organized a political action organization known as "Chemical Farming Banned." In early August, 1978, plaintiff sought a petition from the Secretary of State which

would have enabled him to run for North Dakota's lone seat in the United States House of Representatives as a "new" or "third" party candidate under the party designation "Chemical Farming Banned." The Secretary advised plaintiff that the filing deadline for petitions to place a new political party on the ballot had passed. The time for filing petitions for individual nominations was still open and plaintiff filed a timely petition and qualified as an individual nomination candidate for Congress in the 1978 election. Section 16–03–02 permits an individual nomination candidate to designate in not more than five words the party or principle he represents. Plaintiff's name appeared in the "independent" column on the ballot over the designation "Chemical Farming Banned."

The day before the November 7 election, plaintiff, acting pro se, commenced an action seeking declaratory and permanent injunctive relief and a temporary restraining order to stop the election, on the ground that the ballot to be used discriminated against independent candidates and candidates of small minority parties. The court denied the application for a temporary restraining order and the election was held.[2] On motion of defendants the complaint was later dismissed for failure to state a claim. Plaintiff appealed the ruling.[3] The Court of Appeals vacated the dismissal and remanded the case to this court for further proceedings. *McLain v. Meier*, 612 F.2d 349 (8th Cir. 1979). The case is now before this court on an amended complaint prepared by the American Civil Liberties Union.

## THIRD PARTY BALLOT ACCESS LAW

Section 16–04–20 states in pertinent part as follows:

The following political parties shall be provided with separate columns on primary election ballots:

1. The Republican party;

2. The Democratic party;

3. Any party which cast five percent of the total votes cast for governor at the last general election; and

4. Any other party if a petition signed by fifteen thousand or more electors of this state is filed with the secretary of state before four o'clock p. m. on June first of any primary election year, asking that a column be provided for such party, naming it, and stating the platform principles thereof. If such petition is mailed it shall be in the possession of the secretary of state before four o'clock p. m. on June first. Candidates of such party shall be entitled to the same rights and privileges as those of other parties.

Plaintiff contends that the first and fourteenth amendments are violated by the unreasonable burden imposed on new political parties by the 15,000 signature requirement,[4] the June 1 filing deadline and the primary election requirements of § 16–04–20(4).[5]

The initial inquiry in such a challenge is the level of scrutiny to which the statute must be subjected, since the court must examine, under the appropriate test, the state interests advanced by the statute and the relationship between those interests and the means employed to further them.

In reviewing state classifications, courts generally adhere to the rule that a state does not act unlawfully if the classifi-

---

**2.** Plaintiff lost his bid for the House Seat, receiving 3,197 votes out of the 220,348 total votes cast.

**3.** It was in the appeal stage that the American Civil Liberties Union first became involved in the action.

**4.** In 1978, there were 455,000 eligible voters in North Dakota. Thus, § 16–04–20(4) imposes slightly less than a 3.3% signature requirement.

**5.** Defendants argue that plaintiff has no standing to bring the suit since he has not yet decided whether he will be a candidate in 1980. The argument is misplaced. Plaintiff was a candidate in 1978 and allegedly harmed at that time. As stated in this court's Order of December 28, 1979, although the election has passed, this action is not moot.

cation is rationally related to a legitimate government objective. *See Dandridge v. Williams,* 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 67, 31 S.Ct. 337, 55 L.Ed. 369 (1911). This has been referred to as the rational basis test. When classifications are based upon certain "suspect" criteria or affect "fundamental rights," the classification will be subjected to strict scrutiny and the state must show a compelling and substantial interest to justify it. *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969).

▮ The right to be a candidate for public office is not viewed as a fundamental right which in and of itself warrants strict scrutiny. *Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972). Restrictions on ballot access, however, burden two distinct and fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Election Bd. v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230, 241 (1979). However, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. *Bullock v. Carter,* 405 U.S. at 143, 92 S.Ct. at 855. It is only *"substantial burdens"* on the right to vote or to associate for political purposes which are constitutionally suspect and invalid under the first and fourteenth amendments unless essential to serve a compelling state interest. *Storer v. Brown,* 415 U.S. 724, 729, 94 S.Ct. 1274, 1278, 39 L.Ed.2d 714 (1974). The right to vote is recognized as a fundamental right and if a statute impinges upon the status of candidacy so as to have, ". . . a real and appreciable impact on the exercise of the franchise . . . ," *Bullock v. Carter,* 405 U.S. at 144, 92 S.Ct. at 856, "the law must be closely scrutinized." *Id.* But only if such a "real and appreciable impact" is shown, should the court abandon the rational basis test. *Antonio v. Kirkpatrick,* 579 F.2d 1147, 1149 (8th Cir. 1978).

"In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock, supra* at 143, 92 S.Ct. at 856. To do so, it is also necessary to examine the ballot access alternatives available.

North Dakota conducts primary, general and special elections. Most of the elections are partisan, i. e., conducted along party lines. All recognized political parties are required to enter the primary election held on the first Tuesday in September of each year in which a general election is held. Section 16–04–01. General elections are held on the Tuesday immediately following the first Monday in November of each even numbered year. Section 16–06–01.

As indicated, § 16–04–20 assures separate "party columns" on the primary and general election ballots to the Democratic and the Republican parties. A separate party column is also afforded to any third party able to poll in the preceding election, 5% of the total vote cast for governor. *Id.* A "new" third party may secure a separate party column if it files a petition containing at least 15,000 signatures of qualified electors before June 1 of the year of a general election. *Id.*

A person who wishes to run as an independent, or a person who wishes to run as a representative of an organized political group which did not qualify as a party under § 16–04–20, can gain access to the ballot by filing an individual nominating petition with the Secretary of State not less than 40 days before the general election, signed by at least 300 qualified electors. Sections 16–03–02 and 16–05–03. Such a candidate need not enter the primary election and may have his name followed by a statement of five words or less setting out the "party or principle" he represents. Section 16–03–02.

Plaintiff relies principally upon *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) and *MacBride v. Exon,* 558 F.2d 443 (8th Cir. 1977), in urging the court to apply the strict scrutiny standard

of review, and to require the state to show a compelling government interest to justify the signature and filing date requirements of § 16–04–20.

In *Williams, supra,* under Ohio election laws, a new political party seeking ballot position had to obtain petitions signed by qualified electors totalling 15% of the ballots cast in the last gubernatorial election and had to file these petitions early in February of the election year. These requirements virtually precluded a new party's qualifying for ballot position and there was no provision for independent candidates obtaining ballot position. The Court found that under such circumstances the laws placed "*substantially* unequal burdens on both the right to vote and the right to associate." 393 U.S. at 31, 89 S.Ct. at 10 (emphasis added). Thus strict scrutiny was appropriately applied.

The *Williams* case, however, was distinguished in *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). In *Jenness,* Georgia law provided that any political organization whose candidate received 20% or more of the vote at the last gubernatorial or presidential election was a "political party." Any other political organization was a "political body." Candidates of political parties were assured of ballot position. A candidate of a political body, or an independent candidate could have his name on the ballot if he filed a nominating petition before the second Wednesday in June, signed by at least 5% of those eligible to vote at the last election for the office he was seeking. In upholding the 5% requirement, the Court contrasted this system with that faced in *Williams.*

> Unlike Ohio, Georgia freely provides for write in votes. Unlike Ohio, Georgia does not require every candidate to be the nominee of a political party, but fully recognizes independent candidacies. Unlike Ohio, Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties. Unlike Ohio, Georgia does not impose upon a small party or a new party the Procrustean requirement of establishing elaborate primary election machinery. Finally, and in sum, Georgia's election laws, unlike Ohio's, do not operate to freeze the status quo.

403 U.S. at 438, 91 S.Ct. at 1974.

North Dakota's election laws are akin to *Jenness* and contain none of the objectionable restrictions found in *Williams.* In North Dakota a candidate can get on the ballot with a minimum effort. Alternative routes to the ballot are provided. A candidate may seek the support of one of the major parties either by petition or endorsement and enter the primary election. Section 16–04–02. A candidate can become a recognized political party by merely filing a petition meeting the requirements of § 16–04–20 and entering the primary. A candidate unable to come up with the support required to qualify under § 16–04–20, can, as an independent candidate or under the sponsorship of a political organization, get on the ballot through the process of individual nomination by obtaining a mere 300 signatures before late September. Sections 16–03–02 and 16–05–03. By utilizing this latter route, the candidate forgoes the primary. North Dakota also provides for write–in campaigns. Section 16–12–06. In the words of *Jenness, supra* at 442, 91 S.Ct. at 1976, North Dakota ". . . has insulated not a single potential voter from the appeal of new political voices within its borders."

Plaintiff also relies on *MacBride v. Exon, supra.* In *MacBride,* Nebraska law provided that the only way a candidate for President or Vice President could get his name on the ballot was to be named as a candidate by an existing recognized party or by a new party which had achieved recognition. There was no provision for independent candidacies. For a new party to gain recognition it had to file, at least 90 days prior to the next primary, a petition signed by at least 1% of the total vote cast for governor in the last election. In *MacBride,* plaintiffs, candidates of the Libertarian Party, would have had to file their petition some nine months before the general election in order to get on the ballot. They contended that

the early filing deadline together with the failure to provide for independent candidates unconstitutionally restricted access to the ballot. The court agreed.

> While the organized support that may rally around an independent candidate after the national conventions of the major parties may give itself a party label, it is not ordinarily a political party in the sense that it is an organization having a continuity of existence from year to year and election after election. It is more in the nature of an ad hoc committee set up on a more or less national basis to support an independent candidate. *Nebraska has no means whereby an independent can get on the presidential ballot, and in that respect the Nebraska statutory scheme (and doubtless the schemes of other states as well) is constitutionally deficient.*

558 F.2d at 449 (emphasis added).

It was not the filing deadline alone that caused the court to invoke the strict standard of review and strike down the statute. The court was concerned that a candidate unable to gain the organized support early enough to meet the deadline was foreclosed from the ballot. "[A] state may not constitutionally impose requirements or restrictions based on time or organizational structure which effectively prevented a third party presidential candidate from ever gaining a position on the state's general election ballot." *Id.*

■ It is clear that North Dakota ". . . in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life." *Jenness, supra* at 439, 91 S.Ct. at 1975. Section 16–04–20(4) [6] does not foreclose ballot access. Plaintiff did get on the ballot by the process of individual nomination. It cannot be said that the requirements of Section 16–04–20(4) have "a real and appreciable impact on the exercise of the franchise." *Bullock, supra* at 144, 92 S.Ct. at 856.

It is true that, ". . . the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer v. Brown*, 415 U.S. at 745, 94 S.Ct. at 1286. Thus an independent candidate cannot be forced to choose the political party route if he wants to appear on the ballot. *Id.* at 746, 94 S.Ct. at 1286. In the instant case, plaintiff, a representative of "Chemical Farming Banned," did not have to give up this "association" in order to appear on the ballot. He did not have to join a major party nor did he have to run as a true independent, untied to any political organization. Rather, he was allowed to appear on the ballot with the designation of his party or principle. This imposed no "substantial burdens on his right to associate for political purposes." *Storer, supra* at 729, 94 S.Ct. at 1279.

In the absence of a substantial burden on the fundamental rights of voting and political association, the proper standard to be applied is the rational basis standard, i. e., whether the statute is rationally related to a legitimate government objective.

Article I, Section 4, clause 1 of the United States Constitution provides as follows:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

Section 16–04–20(4) has not been preempted by federal law.

■ Requiring a non–established political party to obtain signatures of about 3.3% of the number of eligible voters on a petition to be filed a little over 90 days before the primary is rationally related to the legitimate state objective mentioned in *Jenness, supra* at 442, 91 S.Ct. at 1976.

There is surely an important state interest in requiring some preliminary show-

---

**6.** Once on the ballot, the candidate's position thereon depends on the route he used to get there. Section 16–04–20(4), however, has not been challenged on grounds of "positional bias."

ing of a significant modicum of support before printing the name of a political organization's candidate on the ballot–the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

The June 1 filing deadline for primary ballot placement also affords the State sufficient time to certify petitions and verify signatures and to print and distribute the primary election ballots. By requiring the number of signatures it does and the earlier filing deadline, the State meets these interests and it does so reasonably by providing alternative ballot access routes.[7]

■ The Democrat and Republican parties are major, well established political parties in North Dakota. The fact that a candidate of a political organization seeking ballot position and party recognition under § 16–04–20(4) must prove the party's support while the major parties are automatically given ballot position, does not make the statute unconstitutionally defective.

> The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. [A state is] . . . not . . . guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot.

*Jenness, supra* at 441–42, 91 S.Ct. at 1976.

■ Plaintiff's complaint also alleged that it is an unconstitutional burden to require third parties who gain § 16–04–20(4) ballot access to enter the state primary. Although North Dakota has such a require-ment for all "recognized" political parties, it is not a complex procedure. There is only one primary held and all parties are placed on one ballot. Section 16–04–15.1. It is clear that a state, "may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled before the general election by primary election or by party convention." *American Party of Texas v. White*, 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974). A political organization in North Dakota too small to handle the primary burden can, as the plaintiff did, avoid it by resorting to the individual nomination procedure. These alternative procedures are not a burden on the right of association for the advancement of political beliefs or on the right of qualified voters to cast their ballots effectively. There is nothing in Section 16–04–20(4) that abridges the rights of free speech and association secured by the first and fourteenth amendments nor the rights of equal protection under the fourteenth amendment. The section is rationally related to the state's legitimate interest in regulating its electoral process in a reasonable manner.

## BALLOT POSITION BIAS

Plaintiff alleges that §§ 16–11–05(4) and 16–11–06, which describe the form of the ballot and the arrangement of names on the ballot, discriminate against individual nomination candidates in favor of recognized party candidates, in violation of the fourteenth amendment.

Section 16–11–05 provides as follows:
The official ballots provided for in this title for partisan election at general elections in precincts in which voting ma-

---

**7.** The fact that a well organized third party can gather the required signatures within the June 1 deadline is illustrated by the American Party's success in getting on the ballot in 1976. In an affidavit submitted on behalf of plaintiff by the North Dakota chairman of the American Party, she describes the large number of volunteers and man hours needed to procure the signatures and the large expense incurred. An affidavit of a 1978 independent candidate and one of a member of the Libertarian party state that a great deal of manpower, money and material would be needed to meet the signature requirement. This does not make the statute unconstitutional. "Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." *American Party of Texas v. White*, 415 U.S. 767, 787, 94 S.Ct. 1296, 1309, 39 L.Ed.2d 744 (1974). It is of interest that all those who filed affidavits on behalf of plaintiff did get on the ballot by either the § 16–04–20(4) process or individual nomination.

chines are not used shall be prepared as follows:

1. The ballots shall be of sufficient width to contain all of the tickets to be voted for, under the appropriate party designation for each;

2. On the left–hand side of such ballot shall be a column designating the office to be voted for, and on the same line, in the column under the appropriate party designation of each, all of the names of the candidates duly nominated for that office shall be printed;

3. The names of candidates under headings designating each official position shall be alternated on the official ballot in the printing in the same manner as is provided in the primary election ballot;

4. The names of all persons nominated by petition shall be placed in one column under the designation of "independent nominations" in the lines respectively specifying the offices for which they are nominated; and

5. The size of type shall be as specified by the secretary of state.

In precincts in which voting machines are used, the list of offices and candidates and the statements of measures and questions to be submitted to the voters shall be arranged in a manner and form approximating as far as possible the requirements of this section.

Section 16–11–06 [8] provides in pertinent part as follows:

The ballot provided for in section 16–11–05 shall be arranged as follows: The names of the candidates of the party casting the highest number of votes in the state for members of Congress at the last preceding general election shall be arranged in the first or left–hand column

of such ballot; of the party casting the next highest number of votes in the second column; of the party casting the next highest number of votes in the third column; and of such other party as the secretary of state may direct for state officers. . . .

In 1978, the only individual nomination candidates for the United States House of Representatives were plaintiff and one other. Pursuant to § 16–11–05(4), both were listed in one column on the ballot. Each of the major party candidates, pursuant to § 16–04–20, were placed in separate party columns. Since the Republicans had received the most votes in the last congressional election, they were placed in the first column. The Democrats, having received the second highest number of votes, were placed in the second column. The third column went to the individual nomination candidates.[9]

Plaintiff's argument is basically that his placement on the ballot resulted in a "positional bias" against him, costing him votes. Plaintiff asserts that the strict scrutiny standard of review must be applied, requiring the state to show a compelling need for this type of ballot placement. But, as has been stated previously, the test is whether the statute has "a real and appreciable impact on the exercise of the franchise." *Bullock v. Carter, supra.* If so, strict scrutiny is appropriate, if not, the traditional rational basis test is applicable. *Antonio v. Kirkpatrick, supra.*

The cases which plaintiff cites in support of his position on § 16–11–05(4) are all *ballot access* cases, i. e., candidates were being kept off the ballot. *See Williams v. Rhodes, supra; Storer v. Brown, supra; American Party of Texas v. White, supra; MacBride v. Exon, supra.* None of these

---

**8.** It should be noted that 1979 N.D.Sess.Law ch. 271, § 16 enacted new section 16.1–06–07 which will replace § 16–11–06 and provide for rotating ballot positions between the first two party columns. This section has been suspended because of referral of the bill to a vote of the electors at the September 1980 primary election. The question of the validity of this provision is not before the court.

**9.** For a better understanding of the appearance of the ballot, in Appendix I to this order is a copy of the top portion of the ballot used in most of the counties of the state. In Appendix II is the ballot form that was used in Barnes and Morton Counties. The ballots reproduced are only partial ballots relevant to the issues in this case.

cases discussed positional disparities on the ballot. In these cases the burden was substantial because the restriction led to absolute exclusion of certain voter options through denial of ballot access or by denial of the franchise itself. *Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252, 1260 (9th Cir. 1978), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2167, 60 L.Ed.2d 1049 (1979). Sections 16–11–05 and 16–11–06 do "not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice." *Buckley v. Valeo*, 424 U.S. 1, 94, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). The Court in *Buckley*, referring to this line of cases, stated as follows:

> These cases [applying exacting scrutiny], dealt primarily with state laws requiring a candidate to satisfy certain requirements in order to have his name appear on the ballot. These were, of course, direct burdens not only on the candidate's ability to run for office but also on the voters' ability to voice preferences regarding representative government and contemporary issues.

424 U.S. at 94, 96 S.Ct. at 670. These cases are not persuasive because they dealt with issues that were both factually and legally different than the issue relating to § 16–11–05(4). Other court decisions are more helpful to a determination of whether the statute substantially interferes with fundamental rights.

Plaintiff's position is that his vote–getting potential was impaired because he did not appear alone in a ballot column. He analogizes it to the advantage a candidate enjoys in first position on the ballot pursuant to § 16–11–06. It is true, as argued by plaintiff, that §§ 16–11–05(4) and 16–11–06 have substantially the same impact on the right to vote and each should be subjected to the same standard of review. If the statutes in fact have an appreciable impact on the exercise of the franchise, it is because a certain percentage of non–informed electors vote for a candidate solely because

of the candidate's position on the ballot. Such a vote "dilutes" the vote of the informed elector that votes for the candidate of his choice whose name has a less favorable ballot position.[10]

Several courts have considered so–called "incumbent first" laws. Plaintiff in urging strict scrutiny relies principally upon *Gould v. Grubb*, 14 Cal.3d 671, 122 Cal.Rptr. 377, 536 P.2d 1337 (1975). In *Gould*, a city charter provision provided that incumbents be listed first on ballots for city council elections. The court agreed with the trial court's finding that first position on the ballot was an advantage since non–informed voters tend to vote for the candidate in the first position. The court held that the provision had a " 'real and appreciable impact' on the equality, fairness and integrity of the electoral process." 122 Cal. Rptr. at 383, 536 P.2d at 1343. Equating the issue with that found in the reapportionment cases, the court applied strict scrutiny on the theory that positional bias dilutes the weight of votes of those supporting nonincumbent candidates.

*Gould* is helpful in resolving the issue now before this court but should not be followed because of the elements which distinguish it.

*Gould* dealt with nonpartisan elections. Section 16–11–05 is limited by its terms to partisan elections. The Minnesota Supreme Court in a case before it, *Ulland v. Growe*, Minn., 262 N.W.2d 412 (1978), *cert. denied*, 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978), commented on this distinction.

> [T]he election in *Gould* was nonpartisan. The Minnesota statute at issue here applies only to *partisan* elections. The experts at trial agreed that the effect of positional bias is much less pronounced in partisan elections. Most significantly, the evidence clearly establishes that party designation is of far greater importance than ballot position.

262 N.W.2d at 416.

There is no evidence before the court of the behavior of North Dakota voters in

---

**10.** Plaintiff has not suggested that a person entering the voting booth intending to vote for

him would have had difficulty locating his name on the ballot.

partisan elections. Plaintiff submitted an affidavit of George E. Bardwell, Joint Professor of Mathematics and Statistics of the University of Denver. Therein he states he has reviewed several studies which conclude that the candidate in the first position on the ballot enjoys an advantage of at least 5%. As noted by the court in *Ulland, supra,* two of the four studies relied on, Scott, *California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents,* 45 So.Cal.L.Rev. 365 (1972) and H. Bain and D. Hecock, Ballot Position and Voter's Choice: The Arrangement of Names on the Ballot and Its Effect on the Voter (1957), were largely concerned with nonpartisan elections. 262 N.W.2d at 414 n.5. An inference arises that some advantage may accrue to the candidate whose name appears first on the ballot in a partisan election but the inference is insufficient to support a requirement of strict scrutiny.

In *Gould* the court supported its conclusion that strict scrutiny was required on the reasoning of the reapportionment cases. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The Minnesota court in *Ulland* at 416 rejected that reasoning and in a footnote quoted the reasoning of *Clough v. Guzzi,* 416 F.Supp. 1057 (D.Mass.1976), in a case that challenged a Massachusetts statute that gave incumbents first position on the ballot and also designated them as incumbents.

The state practice here differs significantly from those in the apportionment and other voting cases where the courts

have exercised strict scrutiny, in that it does not create the same kind of immutable or absolute advantage or preclusion. In the apportionment cases, the district lines and populations were fixed and the effects of malapportionment unavoidable for voters within the disadvantaged districts. In contrast, the dilution effect herein depends upon the existence of a pool of presumably uninformed voters. Yet nonincumbents and their supporters have access to those voters and may, in theory and possibly in practice, so educate them as to eliminate the donkey vote and thus eliminate the statistical bias. Furthermore, the impact of the Massachusetts statutes on the total vote is not so clear that we can really define with anything approaching certainty, as would be possible in the apportionment cases, how significantly the state is directly affecting the weight of anyone's vote. The principle of dilution as affecting the fundamental right to vote would seem better reserved for the more clear–cut and certain cases of inequality.

416 F.Supp. at 1067.

■ The plaintiff has failed to demonstrate that North Dakota ballot position disparities have a real and appreciable impact on the exercise of the right to vote[11] or that they substantially interfere with the voters right to choose the candidate of their choice. This court will follow the Minnesota Supreme Court and apply the rational basis test in its review of §§ 16–11–05 and 16–11–06.[12]

11. Plaintiff relies on a line of cases from the Seventh Circuit in support of his claim of positional bias. These cases dealt with "intentional and purposeful discrimination" by the election board in placing the party it preferred in the first position. *E. g., Sangmeister v. Woodard,* 565 F.2d 460 (7th Cir. 1977), *app'l dismissed,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978). The court does not deem these decisions persuasive in this case. Another case relied on by plaintiff, *Elliot v. Secretary of State,* 295 Mich. 245, 294 N.W. 171 (1940), is specifically applicable to *nonpartisan* elections, and was based on the state constitution.

12. This appears to be the position of the majority of the courts which have either directly or indirectly, addressed a similar "non–ballot ac-

cess" issue. *E. g., Bd. of Election Com'rs v. Libertarian Party,* 591 F.2d 22, 27 (7th Cir. 1979), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); *Socialist Workers Party v. March Fong Eu,* 592 F.2d 1252, 1261 (9th Cir. 1978), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2167, 60 L.Ed.2d 1049 (1979); *Krasnoff v. Hardy,* 436 F.Supp. 304, 308 (E.D.La.1977); *Gilhool v. Chairman & Com'rs, Philadelphia Co. Bd. of Elec.,* 306 F.Supp. 1202, 1209 (E.D.Penn.1969), *aff'd* 397 U.S. 147, 90 S.Ct. 996, 25 L.Ed.2d 182 (1970); *Voorhes v. Dempsey,* 231 F.Supp. 975, 977 (D.Conn.1964); aff'd, 379 U.S. 648, 85 S.Ct. 612, 13 L.Ed.2d 552 (1965); *Voltaggio v. Caputo,* 210 F.Supp. 337, 339 (D.N.J.1962), *app'l dismissed,* 371 U.S. 232, 83 S.Ct. 325, 9 L.Ed.2d 494 (1963).

The traditional rational basis standard has been described as follows:

> The distinction drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal • . . . *[S]tatutory classifications will be set aside only if no grounds can be conceived to justify them.*

*McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969) (emphasis added). *See also McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

Plaintiff argues that North Dakota could keep the size of the ballot manageable and still treat all candidates equally. This, it is asserted, could be done by giving each candidate a separate column until there are, for example, eight candidates, whereupon all candidates would be listed in one column on a rotating basis. And each party column would be rotated so as to have an opportunity to be first on the ballot.

The state has the power to organize its ballot. U.S.Const. Art. I, § 4, cl. 1. It also has an important interest in avoiding voter confusion and frustration at the election. *Jenness v. Fortson*, 403 U.S. at 442, 91 S.Ct. at 1976.

The descriptions of the offices to be filled are listed on the far left side of the North Dakota ballot. As more columns are added, the names of the candidates in the succeeding columns to the right become farther removed from the description of the office being sought. The established political parties usually present a full slate of candidates for all of the offices to be filled. As a rule an independent candidate or a candidate of an unfamiliar political body or party who gains access to the ballot by individual nomination is not a part of a full slate of candidates and may be the only candidate listed in the column in which his name appears. Depending upon the office sought, if there are several independent candidates seeking several different offices and if those independent candidates are in columns to the left of the columns of the major parties that have a full slate, the result could be that the names of the candidate for most of the offices to be filled would be far removed from the description of the office. The result would be an unwieldy and confusing ballot.

North Dakota has a legitimate interest in placing the candidates of the major parties, rather than individual nomination candidates, adjacent to the office descriptions. "[It is] permissible to choose the alternative that would make the ballot as convenient and intelligible as possible for the great majority of voters, who, history indicated, would wish to vote for a candidate of one of the two major parties." *Bd. of Election Com'rs v. Libertarian Party*, 591 F.2d 22, 27 (7th Cir. 1979), *cert. denied*, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979).

Sections 16–11–05(4) and 16–11–06 bear a rational relationship to a legitimate state interest and thus do not violate the equal protection provisions of the fourteenth amendment. *See e. g., Clough v. Guzzi, supra* at 1068; *Ulland v. Growe, supra* at 418; *Ihlenfeldt v. State Election Bd.*, 425 F.Supp. 1361, 1364 (E.D.Wis.1977).

IT IS ORDERED that judgment be entered dismissing plaintiff's complaint and cause of action.

APPENDIX I to follow.

APPENDIX I

CASS COUNTY

# GENERAL ELECTION BALLOT

To vote for a person whose name is printed on the ballot mark a cross (X) in the square at the right of the name of the person for whom you desire to vote. To vote for a person whose name is not printed on the ballot write or paste his name in the blank space provided for that purpose.

| NAME OF OFFICE | REPUBLICAN | DEMOCRAT | INDEPENDENT NOMINATIONS |
|---|---|---|---|
| REPRESENTATIVE IN CONGRESS Vote for (ONE) Name Only | MARK ANDREWS ☐ | BRUCE HAGEN ☐ | HARLEY J. McLAIN (Chemical Farming Banned) ☐ |
|  |  |  | DON J. KLINGENSMITH (National Statesman) ☐ |
| STATE SENATOR 13th DISTRICT Vote for (ONE) Name Only | CLAYTON A. LODOEN ☐ | RAY METZGER ☐ | ☐ |
| MEMBERS HOUSE OF REPRESENTATIVES 13th DISTRICT Vote for (TWO) Names Only | DANNY OLSON ☐ | ROY T. KRAJECK ☐ | ☐ |
|  | FLORENZ BJORNSON ☐ | L.E. BERGER ☐ | ☐ |
| PUBLIC SERVICE COMMISSIONER Vote for (ONE) Name Only | RICHARD "Dick" ELKIN ☐ | ROBERT E. "BOB" HANSON ☐ | ☐ |

APPENDIX II

# PARTY BALLOT , FIL

8

| | | |
|---|---|---|
| **REPRESENTATIVE IN CONGRESS** | MARK ANDREWS<br>Republican | 2 → |
| | BRUCE HAGEN<br>Democrat | 4 → |
| Vote for ONE | HARLEY J. McLAIN<br>(Chemical Farming Banned) | 6 → |
| | DON J. KLINGENSMITH<br>(National Statesman) | 8 → |
| **MEMBERS OF HOUSE OF REPRESENTATIVES**<br><br>**24TH DISTRICT** | DON BRiGE<br>Republican | 10 → |
| | FRANK LARSON<br>Republican | 12 → |
| | DEAN MORGAN<br>Democrat | 14 → |
| Vote for TWO | RALPH WINGE<br>Democrat | 16 → |
| **PUBLIC SERVICE COMMISSIONER** | RICHARD "Dick" ELKIN<br>Republican | 18 → |
| Vote for ONE | ROBERT E. "Bob" HANSON<br>Democrat | 19 → |