Donald GILL, Joseph Carlevale, Sr., Joseph F. Devine, Anthony Almonte, Robert Plante, et al., Plaintiffs,

v.

STATE OF RHODE ISLAND, Barbara Leonard in her official capacity as Secretary of State, the members of the General Assembly in their official capacity, Bruce Sundlun in his official capacity as Governor, Joseph Distephano in his capacity as Chairman of the Rhode Island Board of Elections, Guy Dufault in his capacity as Chairman of the Rhode Island State Democratic Committee and John Holmes in his capacity as Chairman of the Rhode Island Republican State Committee, Defendants.

No. CA 94–0331B.

United States District Court,
D. Rhode Island.

July 12, 1996.

Donald Gill, West Warwick, RI, pro se.

Joseph Carlevale, Sr., West Greenwich, RI, pro se.

Joseph F. Devine, Providence, RI, pro se.

Robert Plante, West Warwick, RI, pro se.

Anthony Almonte, Cranston, RI, pro se.

Thomas A. Palumbo, Attorney General's Office, Providence, RI, Katherine A. Merolla, Pucci, Golden & Merolla, Providence, RI, Peter P.D. Leach, Updike Kelly and Spellacy, Providence, RI, Anthony Bucci, Robert Fine, Richard Licht, Patrick Guida, Tillin-ghast, Licht & Semonoff, Providence, RI, Robert E. Craven, Giannini & Craven, Providence, RI, for Defendants.

## *OPINION*

FRANCIS J. BOYLE, Senior District Judge.

Plaintiffs have filed a blunderbuss constitutional challenge to the election laws of the State of Rhode Island. For the following reasons the laws are found to be constitutional.

### I. BACKGROUND:

Plaintiffs ran for various public offices in the 1992 Rhode Island general election as "independent" or "unaffiliated" candidates under a collective platform they dubbed Reform '92. Joseph Devine ran for Governor, Anthony Almonte ran for Attorney General, Joseph Carlevale ran for Secretary of State, Robert Plante ran for Senator in the 19th District and Donald Gill ran for Mayor of West Warwick. All lost to either Democratic or Republican candidates. Plaintiffs filed this action in June of 1994 claiming that all of the election laws of the State of Rhode Island were unconstitutional. The main contention that can be gleaned from the rambling, nearly 30 page complaint, which cites among other things George Washington's farewell address and the Federalist Papers, is that the election laws unconstitutionally discriminate against unaffiliated or "minor" party candidates in favor of Republican and Democratic party candidates. Shortly after the action was filed, and before the 1994 election, plaintiffs Gill, Carlevale, Devine and Plante claimed either Democratic or Republican affiliation and filed declaration papers with the Secretary of State.

At the time this action was commenced, plaintiffs also filed a motion for a preliminary injunction asking that the court enjoin the 1994 Rhode Island general election. The motion was denied on July 25, 1994. In December of 1994, the plaintiffs filed another motion for a preliminary injunction asking that the court enjoin the State of Rhode Island from swearing in all political candi-

dates who won office in the 1994 general election. This motion was also denied.

On February 28, 1996 a non-jury trial was held.[1] While the original complaint cited over 150 different laws that the plaintiffs contended were unconstitutional, for purposes of the trial, plaintiffs agreed to pare that number down to seven representative laws on which the court would rule.[2] The specific laws under scrutiny are:

R.I.G.L. § 17–8–1, *Local Canvassing Authorities,* Appointment of bipartisan authority;

R.I.G.L. § 17–8–5(2), *Local Canvassing Authorities,* Local boards—powers and duties;

R.I.G.L. § 17–14–4, *Nomination of Party and Independent Candidates,* Preparation of nomination papers for candidates—Combination of endorsed candidates—Furnishing of nomination papers to candidates;

R.I.G.L. § 17–15–1 et. seq., *Primary Elections;*

R.I.G.L. § 17–15–8, *Primary Elections,* Listing of candidates on ballots and ballot labels;

R.I.G.L. § 17–25–20, *Campaign Contributions—Expenditures Reporting,* Eligibility criteria for matching public funds;

R.I.G.L. § 17–1–2(f), *General Provisions,* Definitions—"Political Party" or "Party".

## II. ANALYSIS:

■ "Voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (quoting *Ill. Bd. Of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979)). However, the right to vote and the right to "associate for political purposes through the ballot" are not absolute. *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063. The United States Supreme Court has recognized that States retain the power to regulate elections. *E.g., Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973); *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986). The Court has specifically stated that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063 (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). Recognizing that each provision of an election code will inevitably affect First and Fourteenth Amendment rights, the Court has stated that the mere fact that a State election code "creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). Accordingly, in instances in which the constitutionality of voting regulations is called into question, the Court has eschewed a strict scrutiny standard in favor of a flexible standard. *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063.

■ Under this flexible approach, the rigorousness with which a court inquires into the propriety of a challenged election law is dependent upon the extent to which that law is found to burden First and Fourteenth Amendment rights. *Id.* Thus, when such rights are severely burdened, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed,* 502 U.S. 279, 288, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). On the other hand, when a state election law

---

1. At the time the trial was held, there was a motion by the plaintiffs for summary judgment outstanding. Because all issues that were due to be resolved in summary judgment were to be heard at the non-jury trial, plaintiffs withdrew the motion. During the trial, however, plaintiff Almonte continued to press the court for a ruling on the motion. The court declined to hear the motion and proceeded with the trial on the merits.

2. Plaintiff Almonte objected to this agreement stating that he believed all Rhode Island election laws were unconstitutional and should be ruled upon. The court allowed Mr. Almonte until April 19, 1996 to file memoranda of law in support of his challenge to all the laws. To date, no such memoranda have been filed. Thus, Mr. Almonte's contention is deemed moot.

imposes only reasonable, nondiscriminatory restrictions on First and Fourteenth Amendment rights, the State's regulatory interests are generally sufficient to justify the restrictions. *Burdick,* 504 U.S. at 433–36, 112 S.Ct. at 2063–64. Thus, the constitutional claims of the plaintiffs will be examined by parsing them in light of this flexible standard.

1. *R.I.G.L. §§ 17–8–1, 17–8–5(a)(2), 17–1–2(f).*

■ The constitutionality of these related provisions must be examined in conjunction. Title 17 chapter 8 of the Rhode Island General Laws is entitled Local Canvasing Authorities. Section 17–8–1 provides:

> **Appointment of bipartisan authority.—** The legislative body of each city and town shall appoint a bipartisan canvassing authority of three (3) qualified electors of the city or town, not more than two (2) of whom shall belong to the same political party and may appoint two (2) alternate members, not more than one of whom shall belong to the same political party.... The mayor or president of the town council shall nominate the members of the canvassing authority from lists of party voters submitted by the respective chairmen of the city or town political committee, which lists shall contain the names of five (5) times the number of persons to be appointed. If the legislative body shall refuse to approve the nomination of any person to the canvassing authority, the mayor or the president shall submit to the legislative body another person named on one of the lists, and so on until a person shall be appointed; provided, however, if the chairman of the city or town committee of a political party entitled to an appointment shall fail or refuse to submit a list as aforesaid, the mayor or the president shall nominate any party voter of the political party entitled to the appointment.

R.I.G.L. § 17–8–1 (Michie 1994).

Section 17–8–5(a)(2) defines the powers and duties of the local canvassing authority. It states that the board shall:

> Have and discharge all of the functions, powers, and duties of the town council concerning nominations, elections, registration of voters and canvassing rights, the preparing and correcting of voting lists, and other matters relating thereto, which powers are transferred to the local board.

R.I.G.L. § 17–8–5 (Michie 1994).

In addition, the election laws define political party as "any political organization which at the preceding general election nominated a candidate for governor, and whose candidate for governor at the election polled at least five percent (5%) of the entire vote cast in the state for governor." R.I.G.L. § 17–1–2(f) (Michie 1994). These provisions are not discriminatory on their face. The fact is, however, that in Rhode Island, as elsewhere, the Democratic and Republican parties dominate the political scene. Thus, while in theory a party other than the Democratic and Republican party could be represented on a canvassing authority such has not been the case. This fact, however, does not necessarily mean that the provisions are unconstitutional.

The process for the appointment of canvassing authority members is facially nondiscriminatory. The statutory provisions do not specifically refer to any particular political party. What the statutes do is condition a political party's right to nominate members of the local canvassing authority upon its prior success at the polls. The United States Supreme Court has held that the practice of distinguishing between political parties based upon past electoral accomplishment is not per se invidiously discriminatory. *See, e.g., American Party of Texas v. White,* 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974); *see also Werme v. Merrill,* 84 F.3d 479, 485 (1st Cir.1996). The simple fact is that any party has the same opportunity to qualify to nominate members of that party to the board of canvassers. As the First Circuit has recently stated in a similar action, "[e]quality of opportunity exists, and equality of opportunity—not equality of outcomes—is the linchpin of what the Constitution requires in this type of situation. *Werme,* supra at 485.

Additionally, the provisions in question here have absolutely no direct effect on ballot access, the right to vote, or the right to have

one's vote counted. *See id.* Local boards of canvassers perform the administrative functions of running and managing elections. Plaintiffs have offered no evidence, nor is there any reason to believe, that minority parties or independent voters or candidates have been harmed by or are at risk because of these bipartisan administrative bodies.

■ Since the constitutional burden imposed by these provisions is slight at best, a rational basis standard must be applied. *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063. Thus, so long as the state had a rational interest in enacting the provisions, they are constitutional. In this instance, the state has an important regulatory interest in ensuring that elections are run fairly and efficiently. The provisions ensure fairness by providing for a bipartisan board. If, on the other hand, members of the boards were selected at large, it is quite possible that the dominant party of the locality would win all the seats on the board. Furthermore efficiency is obtained by limiting the number of members of the board.[3] It would be impractical to believe that the state could ensure that every voting party and non-affiliated voter was represented on the board. The boards would easily become too unwieldy to properly function as election machinery managers. *See Pirincin v. Bd. Of Elections of Cuyahoga County,* 368 F.Supp. 64, 72 (N.D.Ohio 1973). Thus, because these provisions further the State's important regulatory interest, and the constitutional burden imposed is slight, the provisions are constitutional. *See also Pirincin,* 368 F.Supp. at 80 (Ohio statutory scheme for selecting members of bipartisan county boards of election from the two parties which cast the highest number of votes for governor at the previous election did not violate the Constitution).

2. *R.I.G.L. §§ 17–14–4, 17–1–2(f).*

■ Section 17–14–4 of the Rhode Island General Laws provides that "[c]andidates for nomination for different offices endorsed by the appropriate committee on any party shall be combined on the same nomination papers." R.I.G.L. § 17–14–4 (Michie 1994). This provision allows a political party to combine a "slate" of endorsed party candidates on the same nomination paper. As noted above, however, a political party is limited by definition to those parties whose candidate for governor polled at least five percent (5%) of the vote cast for governor in the preceding election. R.I.G.L. § 17–1–2(f). Plaintiffs contend that this provision discriminates because it effectively requires that independent and non-recognized party candidates get more signatures on their nomination papers than the Republican and Democratic slate candidates.

■ Once again, this provision is not facially discriminatory. The provision does distinguish between political parties based upon past electoral accomplishment. This is not, however, per se invidiously discriminatory. *See, e.g., American Party,* supra, 415 U.S. at 781, 94 S.Ct. at 1306; *Werme,* supra at 485.

In addition, the assertion that § 17–14–4 requires independent candidates and non-recognized party candidates to obtain more signatures is patently false. Section 17–14–7 provides that the nomination papers for the candidates for certain offices must be signed by a certain number of voters.[4] The number of signatures required is dependent upon the elective position. In all cases, the number of signatures required is minuscule in comparison to the eligible population. For example, one thousand (1000) signatures are required for a candidate for United States Senator or Governor of Rhode Island, whereas a town voting moderator requires ten (10) signatures. R.I.G.L. 17–14–7. The effect of

---

3. As one court said one or two independent voters who might be appointed could not truly represent all independent voters as "[e]ach independent voter can really only represent himself [or herself]" *Pirincin,* infra at 72.

4. Section 17–14–7 provides for the following signature requirements for the nomination papers for the candidates for each office: United States

Senator or Governor—one thousand (1000); Congressman—five hundred (500); General State offices—five hundred (500); State Senator—one hundred (100); State Representative—fifty (50); City offices—two hundred (200); Providence City offices—five hundred (500); Voting district moderator or clerk—ten (10); Other offices—fifty (50), (Michie 1994).

§ 17–14–4 in combining the slate of a party on one nomination paper is that when a person signs the slate's nomination paper they are not endorsing one candidate but instead the entire slate. Thus, the slate must be signed by the number of voters equal to that required by the office on the slate which requires the highest number of signatures. Plaintiffs argue that the Democratic or Republican slate need only obtain one thousand (1000) signatures while a similar group of independent or non-recognized party candidates must obtain as many as four thousand five hundred (4500) different signatures. While this may in theory be true, in all practicality it is not the case.

It is true that such a group must obtain four thousand five hundred (4500) signatures, but they do not have to be four thousand five hundred (4500) *different* signatures. In fact, a group of independent candidates could meet the nomination requirements by obtaining only one thousand (1000) different signatures, just like the Republican or Democratic slate. This would simply require that a voter sign more than one nomination paper at the same time. This is certainly not an onerous burden. In addition, it is made even less so because the Rhode Island election laws provide that "[a] voter may sign any number of nomination papers for any office the voter may lawfully vote for at the general election." R.I.G.L. § 17–14–9 (Michie 1994); *see also Jenness v. Fortson,* 403 U.S. 431, 438–39, 91 S.Ct. 1970, 1974–75, 29 L.Ed.2d 554 (1971). In fact, it has been suggested that it may be a more onerous burden to get signatures for the endorsed slate. In such an instance, if a voter does not approve of only one person on the slate he or she may not endorse the entire slate. In effect, it requires that the candidates who otherwise would need as few as ten (10), fifty (50), one hundred (100), two hundred (200) or five hundred (500) signatures instead be endorsed by one thousand (1000) voters.

■ There is a strong state interest "in requiring some preliminary showing of a modicum of support" before placing a candidate's name on the ballot. *Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976. Certainly, an election could not be run efficiently nor fairly if any person who felt the urge to run for political office were allowed on the ballot without first showing some support. The ballots would be crowded and confusing to say the least. *See Lubin v. Panish,* 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974) ("State's interest in keeping its ballots within manageable, understandable limits is of the highest order"); *Bullock,* 405 U.S. at 145, 92 S.Ct. at 857 (State has a legitimate interest in regulating the number of candidates to "prevent clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of ... at least a strong plurality ..."); *Storer v. Brown,* 415 U.S. 724, 732, 94 S.Ct. 1274, 1280, 39 L.Ed.2d 714 (1974) (quoting *Bullock,* supra). These provisions directly further that interest. Thus, the burden, if any, imposed by these provisions is more than outweighed by the State's interest in promoting an efficient and unprejudiced election process.

*3. R.I.G.L. § 17–15–1, et seq.*

■ Title 17, chapter 15 of the Rhode Island General Laws regulates primary elections by political parties. Chapter 15 requires that political parties hold primary elections to select party candidates for the general election rather than hold conventions or caucuses. R.I.G.L. § 17–15–6 (Michie 1994). Once again, however, the term political party as it is used in this chapter is limited by § 17–1–2(f). Plaintiffs challenge chapter 15 in its entirety. It is not entirely clear from the pleadings and arguments upon what grounds the plaintiffs premise their argument. The only rational arguments that may be limned from plaintiffs' case is that they feel the provisions providing for primary elections are unconstitutionally discriminatory because they: (1) do not provide for a state supported primary for minor or unrecognized political parties; and (2) do provide for state sanctioned and funded primaries for the two recognized parties. For the following reasons, title 17, chapter 15 is found to be constitutional.

An indepth analysis of plaintiffs' contentions in this instance is unnecessary as the United States Supreme Court has already addressed these very issues in *American*

*Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). In *American Party*, the Court specifically addressed the question of whether a Texas election law requiring that large parties[5] hold primary elections but also mandating that smaller parties nominate by convention violated the First or Fourteenth Amendments. The Court in holding the provision valid stated:

Neither can we take seriously the suggestion made here that the State has invidiously discriminated against the smaller parties by insisting that their nominations be by convention, rather than by primary election. We have considered the arguments presented, but are wholly unpersuaded by the record before us that the convention process is invidiously more burdensome than the primary election.... If claiming an equal protection violation, the appellant's burden was to demonstrate in the first instance a discrimination against them of some substance. Statutes create many classifications which do not deny equal protection; it is only invidious discrimination which offends the Constitution. Appellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to choose their candidates by primary election. The procedures are different, but the Equal Protection Clause does not necessarily forbid the one in preference to the other.

*American Party*, 415 U.S. at 781–82, 94 S.Ct. at 1306–07 (internal quotation marks and citations omitted).

The Court further reasoned that:

The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. [A State is not] guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes

the grossest discrimination can lie in treating things that are different as though they were exactly alike ...

*Id.* at 782 n. 13, 94 S.Ct. at 1306 n. 13 (quoting *Jenness v. Fortson*, 403 U.S. 431, 441–42, 91 S.Ct. 1970, 1975–76, 29 L.Ed.2d 554 (1971)).

The *American Party* Court also had before it the issue of the constitutionality of a Texas provision providing for public financing from State revenues for primary elections of only those political parties casting 200,000 or more votes for governor in the prior general election. *Id.*, 415 U.S. at 791–94, 94 S.Ct. at 1311–13. The Court upheld the validity of the provision, reasoning that a political party should not be made to bear the burden of the additional expense of a state required primary election. *Id.* at 792–93, 94 S.Ct. at 1311–12. Furthermore, the Court also held that the State was justified in not providing funding to political parties which had not previously shown such widespread public support. The Court specifically stated, "we cannot agree that the State, simply because it defrays the expenses of party primary elections, must also finance the efforts of every nascent political group seeking to organize itself ..." *Id.* at 794, 94 S.Ct. at 1312. Thus, in accord with United States Supreme Court precedent, the Rhode Island election laws providing for State sanctioned and funded primary elections for "political parties" only are constitutional.

*4. R.I.G.L. § 17–15–8.*

■ In addition to challenging title 17, chapter 15 in its entirety as independent or minor party candidates, the plaintiffs also challenge the constitutionality of § 17–15–8 as it applies to unendorsed major party candidates. Section 17–15–8 provides that in the party primary elections "the names and addresses of candidates having the endorsement of their party committees shall be printed in the first column at the right of the

---

5. The Texas law provided that parties which polled more than 200,000 votes in the previous gubernatorial election must hold primary elections, parties which polled less than 200,000 votes but greater than 2% of the overall gubernatorial vote could choose either primary elections or nominating conventions, and parties polling less than 2% had to choose their candidates for the general election by nominating conventions. *American Party*, 415 U.S. at 772–73, 94 S.Ct. at 1301–02.

title of the offices they seek and shall be marked with an asterisk(*) ..." (Michie 1994). Plaintiffs contend that this provision unconstitutionally discriminates against unendorsed party candidates. For the following reasons, this argument also fails.

Plaintiffs have offered absolutely no evidence that the above provision has any appreciable impact "on the right to vote, or the right to have one's vote tallied." *Werme,* 84 F.3d at 485. Additionally, the provision has no impact on ballot access. *Id.* Thus, because the injury to plaintiff's First and Fourteenth Amendment rights are not serious, the State need only show that the election provision has a rational basis. *Id.* at 486; *see also McLain v. Meier,* 496 F.Supp. 462, 472 (1980) (claim of "positional bias" on ballot subjected to rational basis test); *Clough v. Guzzi,* 416 F.Supp. 1057, 1067 (D.Mass.1976) (Massachusetts provision giving incumbents first position on ballot and designating them as incumbents subjected to rational basis test).

 The United States Supreme Court has held that political parties cannot be barred from endorsing candidates. *Eu v. San Francisco Democratic Comm.,* 489 U.S. 214, 229, 109 S.Ct. 1013, 1023, 103 L.Ed.2d 271 (1989); *see also Abrams v. Reno,* 452 F.Supp. 1166, 1171–72 (S.D.Fla.1978), *aff'd,* 649 F.2d 342 (5th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1710, 72 L.Ed.2d 133 (1982) (holding Florida's statutory ban on primary endorsements by political parties unconstitutional). The *Eu* Court held that such a ban violated a political party's freedom of speech and freedom of association protected by the First and Fourteenth Amendments. 489 U.S. at 229, 109 S.Ct. at 1023. As the Court stated, a political party has the right "to select a 'standard bearer who best represents the party's ideologies and preferences.'" *Id.* at 224, 109 S.Ct. at 1020 (quoting *Ripon Society, Inc. v. National Republican Party,* 525 F.2d 567, 601 (D.C.Cir.1975) (Tamm, J., concurring in result), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976)). It is clear, however, that such a right would be moot if the party were not allowed to effectively communicate to party members who this "standard bearer" was. Surely, just as the party has the right to endorse a candidate, the party members have an equally strong interest in knowing who the endorsed person is. *See Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 220, 107 S.Ct. 544, 551, 93 L.Ed.2d 514 (1986) (State has legitimate interest in fostering an informed electorate). The challenged Rhode Island provision is simply a method of allowing parties to unambiguously identify which candidates have been endorsed by the party. In doing so, the State furthers its interest in ensuring orderly, efficient and confusion-free primary elections. Because § 17–15–8 is rationally related to this legitimate interest, it is constitutional.

### 5. *R.I.G.L. § 17–25–20.*

 Plaintiffs also challenge the Rhode Island provision which regulates eligibility for matching public funds. Section 17–25–20 provides in part:

(6) In order to receive payments under this section, any independent candidate shall first meet the following additional minimum requirements:

(a) Raise an amount in qualified private contributions equal to twenty percent (20%) of the total amount eligible to be matched for election as to the office sought;

(b) Receive private contributions from a minimum of two hundred fifty (250) individuals contributing at least twenty-five dollars ($25.00) each; and

(c) Comply with any and all applicable nomination provisions in this title and qualify for the general election ballot pursuant to the process set forth in this title.

R.I.G.L. § 17–25–20 (Michie 1994). Plaintiffs contend that this provision unconstitutionally discriminates against independent candidates. The provision, however, is found to be constitutional.

Once again, this provision has no appreciable impact on First and Fourteenth Amendment rights. There is no burden on the right to vote, or the right to have that vote counted. *Werme,* supra at 485. In addition, given the relative ease with which an inde-

pendent candidate can get on the general election ballot,[6] the inability to obtain matching public funds would have minimal, if any, impact on ballot access. *Id.* Thus, a rational basis standard will be applied. *Id.* at 486.

The State, on the other hand, has a strong interest in allocating public funds efficiently. It is clear that the ideological views of the recognized parties enjoy widespread public support. Rhode Island ensures that this is so through its requirement for political party recognition. *See* § 17–1–2(f). The State, however, can hardly be expected to help support and fund the election campaign of every candidate with political ideologies differing from those of the major parties. It is certainly reasonable for a State to require a showing that an independent candidate's political ideology is to at least some minimal extent accepted and supported by the public before the State gives that candidate public funds.

While it could be argued that the nomination signature requirement does just this, that is not necessarily the case. Some people, for one reason or another, will sign any candidate's nomination papers regardless of that candidate's political stance.[7] On the other hand, people are, for obvious reasons, less likely to support a candidate whose views they don't agree with when such support requires a monetary outlay. Section 17–25–20 helps the State ensure that a candidate and his or her political ideology enjoy at least some minimum public support before they are entitled to matching State election funds. If this provision were eliminated, any independent candidate who met the very modest nomination paper signature requirement would be eligible for State funds. This would place a significant burden on a limited supply of funds. This provision is rationally related to the State's interest in ensuring efficient and economical use of public funds. Thus, it is constitutional. *See Burdick,* 504 U.S. at 433–36, 112 S.Ct. at 2063–64.

**6. R.I.G.L. § 17–1–2(f).**

▮▮▮▮▮ Lastly, plaintiffs challenge § 17–1–2(f) in its entirety, not just as it affects other provisions of the election laws. As noted earlier, § 17–1–2(f) limits recognized political parties to those "political organizations which at the preceding general election nominated a candidate for governor, and whose candidate for governor at the election polled at least five percent (5%) of the entire vote cast in the state for governor." (Michie 1994). Plaintiffs claim that the State's failure to recognize any and all political parties is unconstitutional. For the following reasons the constitutionality of this provision is determined under the rational basis standard.

Generally, in ballot access cases, the Supreme Court has applied strict scrutiny only when ballot access has been absolutely denied. *See, e.g., Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *see also Dart v. Brown,* 717 F.2d 1491, 1499 (5th Cir.1983). In the case of *Anderson v. Celebrezze,* 460 U.S. 780, 787–88, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983), the Court identified two basic constitutional rights affected by such ballot access restriction. The *Anderson* Court stated that "the right to vote is heavily burdened if that vote may be cast only for major-party candidates" and "[t]he exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views ... and a candidate serves as a rallying-point for like-minded citizens." No such burdens, however, apply in this instance. There is no absolute denial of ballot access for candidates who are members of an "unrecognized" political party. Such candidates need only qualify and run as independent candidates. There is absolutely no evidence that failure to have a party recognized and instead have a candidate run as an independent impairs the ability to cast a meaningful vote. *See Dart,* 717 F.2d at 1499–1500. Once again the simple fact is that the State is simply engaging in the

---

6. An independent candidate need only obtain the required number of signatures on the nomination papers. *See* § 17–14–1 et. seq.

7. Such a situation is exacerbated by the Rhode Island provision which allows a voter to sign "any number of nomination papers for any office the voter may lawfully vote for at the general election." R.I.G.L. § 17–14–9 (Michie 1994).

constitutionally permissible practice of distinguishing between parties on the basis of prior electoral success. *See, e.g., American Party of Texas,* 415 U.S. at 781, 94 S.Ct. at 1306. Thus the rational basis standard will be applied.

That is not to say that there may not be some percentage greater than five percent (5%) which might unduly burden ballot access such that a more stringent standard of scrutiny would apply. A five percent (5%) requirement, however, does not cross that threshold. *See Dart,* 717 F.2d at 1502–04 (5% of vote for party candidate in preceding presidential election required for party recognition found to be constitutional under rational basis test); *see also, Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (five percent (5%) petition requirement upheld).

Rhode Island certainly has "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976. The term "political party" "implies a relatively numerous group of people, associated together for common political purposes, with some sort of organization actively functioning in the political arena." *Dart,* 717 F.2d at 1508. For a state to recognize a political party and represent that party on the ballot as such, when in fact there is no such party in the commonly understood sense of the word, can lead to voter deception and confusion. *Id.* In addition, just as the proliferation of candidate names on the ballot may foster confusion, so may an unrestricted proliferation of party names. Thus, requiring a "preliminary showing of a significant modicum of support" for a party before a candidate's affiliation with that party is noted on the ballot also furthers the state interest in minimizing ballot confusion and deception. *Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976. Section 17–1–2(f) is directly related toward the advancement of this interest. Thus, the Rhode Is-

land provision limiting recognized political parties is constitutional.

## III. CONCLUSION:

For the foregoing reasons, the Rhode Island Election Laws considered herein are declared to be constitutional. Judgment will enter for the defendants for costs.

So Ordered.